IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB 10 2009

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| LAMAR BAPTIST CHURCH OF ARLINGTON, INC., | § § § | |
| Plaintiff, | § § | |
| VS. | § § | NO. 4:08-CV-370-A |
| ST. PAUL FIRE AND MARINE INSURANCE COMPANY, | § § § | |
| Defendant. | § § | |

MEMORANDUM OPINION
and
ORDER

Before the court for consideration is the motion for summary judgment of defendant, St. Paul Fire and Marine Insurance Company ("St. Paul"). After having considered the motion, the response thereto of plaintiff, Lamar Baptist Church of Arlington, Inc., ("Lamar"), St. Paul's reply, the summary judgment record, and the applicable authorities, the court has concluded that such motion should be denied. However, the court defines in this memorandum opinion limits on Lamar's claims.

I.

Lamar's Claims

Lamar obtained a judgment in excess of $900,000 on October 23, 2007, against Coronado Builders, Ltd., ("Coronado") in a suit

Lamar filed against Coronado in a state district court of Tarrant County, Texas, in August 2006 seeking to recover damages from Coronado based on allegations that Coronado failed properly to perform a contract it had with Lamar for the construction of a Worship Center Addition. According to Lamar, the roof installed by Coronado through a subcontractor as part of the Worship Center Addition project was defective in several respects, causing the roof and related gutter system to leak, which resulted in financial loss to Lamar.

Lamar asserts that the construction project began in 2000, and that the leaks from the faulty roof and gutter construction began in the winter or spring of 2001 and continued until October 2007. The theories of recovery asserted in the state court action by Lamar against Coronado were promissory estoppel, breach of contract, breach of warranty, and negligence.

In the instant action Lamar maintains that Coronado is the insured in a series of five liability insurance policies issued by St. Paul to Coronado with annual effective dates commencing December 31, 1998, and going through December 31, 2003. Lamar alleges that the insurance policies provided liability insurance protection to Coronado for the claims Lamar made against Coronado in the state court suit. Once Lamar was successful in obtaining

a judgment against Coronado in the state court suit, it filed this action in state court against St. Paul for the recovery of amounts awarded to Lamar against Coronado in the October 23, 2007, judgment plus reasonable and necessary attorneys' fees for the prosecution of this action. The action was removed to this court by St. Paul based on diversity jurisdiction.

## II.

### St. Paul's Motion

St. Paul moves for summary judgment on the following grounds:

First Ground. St. Paul maintains that the state court judgment cannot form the basis of a claim against it under the policies because the policies provide that it cannot be sued on a liability claim unless and until Coronado's liability to Lamar has been finally decided by a trial and determined by a judgment. In support of this ground, St. Paul points out that the judgment resulted from a trial proceeding that Coronado failed to attend, with the consequence that the judgment does not evidence a liability against Coronado decided by a trial.

Second Ground. Alternatively, St. Paul contends that it does not have liability for payment of the judgment because the

judgment resulted from Coronado's violation of a provision in the insurance policies obligating Coronado to cooperate and assist St. Paul in securing and giving evidence, attending hearings and trials, and obtaining the attendance of witnesses, and a provision in the policies that Coronado shall not assume any financial obligation to pay out any money without St. Paul's consent. St. Paul maintains that Coronado's failure to participate in the defense of the proceeding that resulted in the judgment violated the cooperation and assistance provision and constituted an assumption of a financial obligation by Coronado without St. Paul's consent.

Third Ground. The insuring agreement of the policies obligates St. Paul to pay amounts that Coronado becomes legally obligated to pay as damages for property damage caused by an "event." According to St. Paul, there was no property damage caused by an "event," as that term is determined in the policy, i.e., an accident, including continuous or repeated exposure to substantially the same general harmful conditions. In support of this ground, St. Paul points out that the state court lawsuit included causes of action for breach of contract, warranty, and negligence, and that the October 23, 2007, judgment does not specify the liability theory on which the judgment was based. In

particular, according to St. Paul, nothing in the judgment indicates that Lamar's recovery against Coronado was based on a negligence theory or any other accidental cause of action. St. Paul adds under this ground that the water damage to Lamar's property was a natural and expected consequence of knowing about a leaking roof and failing to repair it. From that fact, St. Paul reasons that there was a deliberate failure to repair known problems with the roof, with the result that damages causes by the defects in the roof were not the result of an "accident."

Fourth Ground. Next, St. Paul alternatively contends that the state court judgment did not award damages because of "property damage," as that term is used in the insurance policies.

Fifth Ground. Alternatively, St. Paul relies on a policy exclusion that provides that St. Paul does not cover property damage to the particular part of any property which must be restored, repaired, or replaced because Coronado's work was incorrectly performed on the property.

Sixth Ground. Also alternatively, St. Paul relies on another exclusion in the policies saying that St. Paul will not cover property damage to the particular part of real property

being worked on by or for Coronado if the property damage results from Coronado's work.

Seventh Ground.  In the further alternative, St. Paul relies on the fortuity doctrine as barring Lamar's claims under the St. Paul policies effective from December 31, 2001, through December 31, 2003, maintaining that as to those policies the fortuity doctrine precludes coverage because when those policies were issued the losses resulting from the roof problems were known and in progress.

Eighth Ground.  Finally, St. Paul maintains, in the alternative, that no damages could have occurred during the December 31, 1998, to December 31, 1999, effective period of the earliest-dated policy upon which Lamar relies.[1]

III.

Summary Judgment Standards and
Burdens of Proof

A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby,

---

[1]The condition precedent language in this policy is different from that in the other policies.  As discussed infra, this is of no importance because this policy does not apply to Lamar's claims.  See infra p. 26.

Inc., 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that there is no genuine issue of material fact. Anderson, 477 U.S. at 256. The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986). Once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The party opposing the motion may not rest on mere allegations or denials of the pleadings, but must set forth specific facts showing a genuine issue for trial. Anderson, 477 U.S. at 248, 256. To meet this burden, the nonmovant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]." Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994). An issue is material only if its resolution could affect the outcome of the action. Anderson, 477 U.S. at 248. Unsupported allegations, conclusory in nature, are insufficient to defeat a

proper motion for summary judgment. Simmons v. Lyons, 746 F.2d 265, 269 (5th Cir. 1984).

In a diversity action such as this, the law of Texas determines which party has the burden of proof on pertinent issues of fact. Ideal Mut. Ins. Co. v. Last Days Evangelical Ass'n, Inc., 783 F.2d 1234, 1240 (5th Cir. 1986). Texas law places the burden of proving the existence of coverage under an insurance policy on the party claiming it. Guar. Nat'l Ins. Co. v. Vic Mfg. Co., 143 F.3d 192, 193 (5th Cir. 1998). On the other hand, since 1991 in Texas an insurer has had the burden of proving the applicability of any exclusion in the policy. Id.; see also Telepak v. United Servs. Auto. Ass'n, 887 S.W.2d 506, 507 (Tex. App.--San Antonio 1994, writ denied); TEX. INS. CODE § 21.58(b). However, the insured has the burden to prove the applicability of an exception to an exclusion. Vic Mfg. Co., 143 F.3d at 193. In the instant action, Lamar stands in the place of the insured, Coronado, in its claim for policy benefits.

Under Texas law, the burdens of proof in a declaratory judgment action brought by an insurer seeking a declaration of non-coverage are the same as they would be if the action had been brought by the insured against the insurance company claiming the existence of coverage for a particular claim or event. See Pace

Corp. v. Jackson, 284 S.W.2d 340, 350 (Tex. 1955); McCart v. Cain, 416 S.W.2d 463, 465 (Tex. Civ. App.--Fort Worth 1967, writ ref'd n.r.e.).

## IV.

### Analysis of St. Paul's Grounds

A.  St. Paul's Grounds that the Judgment was Not the Result of a Trial and that Coronado Violated its Duty to Cooperate are Without Merit.

The insurance policies provide that St. Paul cannot be sued on a liability claim until the amount of the insured's liability has been finally decided by a trial, but that, once liability has been determined by a judgment, the party making the claim may be able to recover under the policy up to the limits of the coverage that applies.  St. Paul's Mot., App. at SP 270.  The October 23, 2007, judgment was rendered following a trial.  Coronado had entered an appearance and had filed an answer in the underlying litigation, but failed to appear at trial even though it was notified of the date of trial.  The contractual basis for Lamar's claim and the itemization of Lamar's damages were developed through evidence received at the trial.  The judgment rendered in favor of Lamar against Coronado was consistent with the trial evidence.  Consequently, the amount of Coronado's liability was finally determined by judgment based on a decision by a trial,

with the result that this feature of the insurance policies was satisfied.

In a related vein, St. Paul takes the position that it cannot be held liable for payment of the judgment because of the failure of Coronado to cooperate. In support of the non-cooperation contention, St. Paul points to the provisions of the policies that obligate Coronado, if an accident happens that may involve liability protection provided by the policy, to cooperate and assist St. Paul in securing and giving evidence, attending hearings and trials, obtaining the attendance of witnesses, and not to assume any financial obligation without St. Paul's consent. St. Paul's Mot., App. at SP 271. The court concludes that the cooperation and assist feature is not applicable because St. Paul declined to assume, or participate in, Coronado's defense of the state court lawsuit, with the result that Coronado could not possibly cooperate and assist it in matters related to the lawsuit. Nor did the entry of the judgment against Coronado constitute an assumption by it of any financial obligation.

There is no suggestion in the record that the judgment was a product of any fraudulent or other questionable liability on the part of Coronado. For that reason, Texas court decisions such as State Farm Fire & Casualty Co. v. Gandy, 925 S.W.2d 696 (Tex.

1996), are not on point. The characterization in <u>Trinity Universal Insurance Co. v. Cowen</u>, 945 S.W.2d 819, 821 (Tex. 1997), of the Texas Supreme Court's holding in <u>Gandy</u> is not helpful to St. Paul when the <u>Gandy</u> language to which the Texas Supreme Court referred in <u>Cowen</u> is considered in context with the facts of <u>Gandy</u> and the complete text of the <u>Gandy</u> opinion.

St. Paul's reliance on <u>State Farm Lloyds Insurance Co. v. Maldonado</u>, 963 S.W.2d 38 (Tex. 1998), on the issue of whether or not there was a trial is misplaced. The policy language in <u>Maldonado</u> required an "actual trial." The insurance company in <u>Maldonado</u> undertook its policy obligation to defend its insured. Under those circumstances, the insurance company had a legitimate complaint when the insured failed to cooperate in his own defense.

In the instant action, the insurance company refused to provide a defense to Coronado in the underlying suit, notwithstanding the provision in the insurance policies that St. Paul had the duty to defend Coronado against a claim or suit for injury or damage covered by the policy, even if all of the allegations of the claim or suit are groundless, false, or fraudulent. St. Paul's Mot., App. at SP 311. St. Paul's failure to defend brings into play the rule in Texas that an insurance

company cannot insist on compliance with the "actual trial" requirement of an insurance policy once it has breached its duty to defend.  See Scottsdale Ins. Co. v. Sessions, 331 F. Supp.2d 479, 488 (N.D. Tex. 2003).  There was a trial, but even if there had not been a trial, St. Paul could not gain from its absence.

For the reasons given above, the First and Second Grounds of St. Paul's motion are without merit.

B.    The Leaks in the Roof and Gutter System Constituted an "Event".

St. Paul's Third Ground is based on the meaning of the word "event" as used in the insuring agreement of the policies.  The insuring agreement provides, in part pertinent to this ground, as follows:

> . . . We'll pay amounts any protected person is legally required to pay as damages for covered . . . property damage . . . that:
>
> •    happens while this agreement is in effect; and
>
> •    is caused by an event.
>
> . . . .
>
> *Event* means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

St. Paul's Mot., App. at SP 309.

St. Paul's argument in support of this ground is that the damages did not result from an "accident," and therefore did not result from an "event," because the damages were not unintended or unexpected. As part of its argument, St. Paul emphasizes that the petition in the underlying suit included causes of action for breach of contract and breach of warranty as well as a cause of action for negligence, and that the October 23, 2007, judgment does not specify which cause of action is the basis of the recovery awarded Lamar against Coronado in the judgment. St. Paul also argues that the allegations of Lamar's pleading, as well as the testimony at the trial that led to the judgment, establish that, although Coronado knew of problems with the roof and related gutters, it did nothing to fix them to prevent damage to Lamar. From that premise, St. Paul reasons that the damages did not result from an "accident" but rather were the result of Coronado's deliberate failure to repair the known problems. The arguments advanced by St. Paul in support of the Third Ground conclude with the statement that:

> Therefore, because the Judgment could have been based
> on such evidence of "non-accidental" behavior by
> Coronado, the Judgment pursued by Lamar does not prove
> an "event" as required by the St. Paul policies and

there is, therefore, no coverage under the St. Paul
policies for such Judgment.

St. Paul's Br. at 11.

The fact that the judgment does not specify which cause of
action was the basis of the recovery awarded to Lamar against
Coronado is not dispositive.  Even if the judgment was entered on
the basis of a pure breach of contract claim, the water leaks
nevertheless would constitute an "accident," and therefore an
"event," within the meaning of the policy.  See Grimes Constr.,
Inc. v. Great Am. Lloyds Ins. Co., 248 S.W.3d 171, 172 (Tex.
2008); see also Rotella v. Mid-Continent Cas. Co., No. 3:08-CV-
486-G, 2008 WL 2694754 (N.D. Tex. July 10, 2008).  There is
nothing in the summary judgment record to suggest that the water
leaks were caused by intentional conduct on the part of Coronado
or its roofing subcontractor, nor is there anything in the record
to suggest that Coronado consciously chose not to attempt to
prevent damage to Lamar from the roof leaks.  Rather, the record
indicates that Coronado repeatedly attempted to repair the roof
and its related gutter system in order to prevent the leaks.

For the reasons stated above, the court is unable to find
that the Third Ground has merit.  However, the damages caused by

an "event" appear to be a relatively small part of the $900,000 judgment.

C.  There Was "Property Damage" as That Term is Used in the Policies.

The insuring agreement that is quoted in IV.B. above obligates St. Paul to pay amounts that Coronado is legally obligated to pay as damages for covered "property damage." The term "property damage" is defined in the policies as follows:

> *Property damage* means:
>
> •  physical damage to tangible property of others, including all resulting loss of use of that property; or
>
> •  loss of use of tangible property of others that isn't physically damaged.

St. Paul's Mot., App. at SP 309.

St. Paul's argument in support of its Fourth Ground seems to be that there was no damage to property of others because the damage was to Coronado's own work, i.e., construction of the Worship Center Addition. The court is not persuaded. The record of the trial that resulted in the October 23, 2007, judgment quite clearly defines the elements of damage contained in the judgment and the dollar amount included in the judgment for each element of damage. The $617,861.20 actual-damage award contained in the judgment is shown by the evidence at trial to be made up

of $376,861.20, representing the costs that would be involved in replacing the complete standing-seam roof system and the gutter system with better systems; $11,000.00, representing the amount paid by Lamar to consultants to study the roof and gutter problems in order to determine what would be required to correct the problems; $175,000.00, representing the cost of replacing elements of the tar and gravel roof on the foyer; $5,000.00, representing the cost of replacing ceiling tiles as a result of water leaks; and $50,000.00, representing the cost of removal and replacement of carpet ruined by the water leaks.[2]

---

[2]The testimony on which the $617,861.20 actual-damage award was based is as follows:

Q.    And what fix is going to be required to eliminate the problems that are being experienced by the church?

A.    In that what our consultants say, there is water invasion in the upper portions, that is the standing seam metal roofing. That particular material needs to be replaced with something that is more waterproof and/or better sealed.

In the case of the gutter itself, as far as I'm concerned there is no alternative but to replace the complete gutter system. So we need basically the complete standing seam system removed and replaced with a better system, and the gutter itself needs to be applied with the proper engineering design characteristics.

Q.    Have you talked to experts about the cost of implementing those changes?

A.    Yes.

. . . .

Q.    Okay. And the cost bid that he gave to make the necessary repairs was $376.861.20?

(continued...)

A.      That's correct.

. . . .

Q.      Has the church paid engineers in order to study the problem in order to determine what fix would be necessary?

A.      Paid the consultants.

Q.      Has the church paid approximately ten to $11,000 to consultants?

A.      That's correct.

Q.      Now with respect to the roof itself, we've talked about $376,861.20 to make those repairs.  Besides this roof is there another roof that's been affected over the foyer?

A.      Yes.  The water that as a result of the leaks up above, basically cascades down the inside of these structural chambers here.  The structure, maybe there's 20 percent of an open volume inside those structures.

. . . .

[A].    The foyer roof here has its own internal drains in the center more or less of the foyer.  In order to get water that falls on that foyer roof out of there, it would run to the center of the sloped roofing areas to the drains.  In order to do that there has to be metal roofing underneath this overlaid type ceiling that's in this area, but they penetrate the tunnels so to speak of the structure units here so any water that falls down in here falls on top of the metal itself.  That water then runs underneath the rolled roofing so to speak that is in this area as well, so it also is able to go through that metal roofing or there are well points or structural attachments in the ceiling and things of that nature.  Therefore the water can drop throughout the area of that foyer itself.

. . . .

Q.      Okay.  Now the cost to replace the roof over the foyer, that's not as large a roof area, is it?

A.      No.

Q.      It has a drop down ceiling?

A.      Yes.

(continued...)

Q.     Okay. And to replace that, to take off the tar and gravel and to replace the metal that's rusted under there, would that run anywhere from $150- to $175,000?

A.     That's correct.

Q.     Now in addition to that has the church over the last six or seven years continually been required to replace ceiling tiles throughout the foyer because water has leaked and stained them and you had to continually replace those?

A.     Right. They are decorative type suspended panels and they've been replaced repeatedly.

Q.     And the cost of those ceiling tiles and labor to replace those ceiling tiles, does it approximate about $5,000?

A.     Correct.

Q.     Now the carpet in the foyer there, is it a glue-down carpet?

A.     It's a glue-down carpet.

Q.     And because of the water penetrating the foyer, in fact, you had to have wading pools for kids to catch the water, what impact has that had on the carpet that's there in the foyer?

A.     Well, the carpet of course not only was wet, the mastic had adhered, had glued the carpet to the slab, in places it's loosened, you can see some ripples beginning to form in that, particularly in the areas that the water fell before. It discolored the carpet and then habitual sweeping, water vacuuming, things of that nature. In points that even the carpet looks substantially worn in a number of areas throughout the center of the foyer area.

Q.     And that area is about 30 by 70 feet?

A.     That's correct.

Q.     And the cost to remove the old carpet and replace it with a like kind carpet would be approximately 50,000?

A.     Yeah.

St. Paul's Mot., App. at SP 9-10. The trial record clearly establishes the nature of all of the damages except the $175,000.00 that was included as the cost to replace the roof over the foyer. The court will hear from the parties further on how to deal with any uncertainty related to that item.

Thus, putting aside the cost of replacing Coronado's work (the roof and gutter system Coronado, through a subcontractor, installed), there nevertheless would be damage to the property of others in the form of the water damage to the ceiling tiles and carpet. However, the term "physical damage" would be stretched too far to bring within it the product of the failure of Coronado to perform its contract as it should have been performed. A mere failure of Lamar to receive the kind of roof and gutter system it bargained for does not seem to the court to be "physical damage" to property in any accepted meaning of that term. The only items of damage included in the October 23, 2007, judgment award that appear to be physical damage to property of others would be the water leak damage to the ceiling tiles and carpet (and, possibly, damage to the roof of the foyer).

D.   The Exclusion St. Paul Relies on in Support of Its Fifth Ground does not Exclude from Coverage all Damages Included in the Judgment.

St. Paul's Fifth Ground is based on a policy exclusion saying that St. Paul will not cover property damage to:

> That particular part of any property which must be restored, repaired, or replaced because your work was incorrectly performed on it. But we won't apply this

19

exclusion part to property damage that results from
your completed work.

St. Paul Mot, App. at SP 322.  The term "your work" is defined in

the policies follows:

> *Your work* means:
>
> • any work that you're preforming or others are
> performing for you; or
>
> • any service that you're providing or others are
> providing for you.

Id. at SP 317.  The term "your completed work" is defined by the

policies as follows:

> *Your completed work* means your work that is completed
> at the earliest of the following times, including work
> that may need service, maintenance, correction, repair
> or replacement, but which is otherwise complete:
>
> • When all of the work called for in your contract
> has been completed.
>
> • When all of the work to be done at the work site
> has been completed, if your contract calls for
> work at more than one site.
>
> • When that part of the work at the work site has
> been put to its intended use by any person or
> organization, other than another contractor or
> subcontractor working on the same project.

Id.

There might be an issue as to whether the damage the court

has concluded under the immediately preceding subsection of this

brief was "property damage" within the meaning of the policy

resulted from Coronado's completed work. The indication is that at least some of that damage did result from Coronado's completed work.

Another issue is whether the intent of the first sentence of this exclusionary language is to make clear that the policies do not apply to loss suffered by the insured's customer, Lamar, because of the mere failure of Coronado to provide to Lamar what Lamar was entitled to receive under the construction contract. The court concludes that the only reasonable reading of this policy language is that it excludes from coverage the financial loss suffered by Lamar because of the mere failure of Coronado to provide the kind of roof and gutter system Lamar expected to receive under its contract.[3] Accepting that to be the correct reading, there nevertheless would be coverage under the insurance policy for liability imposed on Coronado for water leak damage to the ceiling tiles and carpet (and perhaps the foyer roof)

---

[3]Apropos to this case is the holding of a Texas court of appeals when confronted with a claim similar to Lamar's claim in this case that "[s]tated simply, there is no coverage for faulty workmanship." Dorchester Dev. v. Safeco Ins., 737 S.W.2d 380, 382 (Tex. App.--Dallas 1987, no writ) (abrogated on another ground by Don's Bldg. Supply v. OneBeacon Ins. Co., 267 S.W.3d 20 (Tex. 2008)). When considering an exclusion similar to the one under discussion in this subsection D, the Dorchester court said that it is apparent from the exclusion that "this policy was not intended to insure against the repair of faulty workmanship by or on behalf of [the insured]." Id. Similar results were reached in the later cases of Houston Building Service, Inc. v. American General Fire & Casualty Co., 799 S.W.2d 308, 310 (Tex. App.--Houston [14th Dist.] 1990, writ denied); Gar-Tex Construction Co. v. Employers Casualty Co., 771 S.W.2d 639, 642-44 (Tex. App.--El Paso 1989, writ denied). See also Malone v. Scottsdale Ins. Co., 147 F. Supp.2d 623, 628-29 (S.D. Tex. 2001).

resulting from the failure of Coronado to provide the quality of roof and gutter system it contracted to provide, so long as the damage was suffered by Lamar after the work had been completed.

E. <u>The Exclusion Upon Which St. Paul Relies in its Sixth Ground Again Makes Clear that There is no Coverage for the Cost of Causing the Property to be What Coronado Contracted to Construct</u>.

St. Paul's Sixth Ground is based on a policy exclusion saying that St. Paul will not cover property damage to:

> That particular part of real property being worked on by or for you if such property damage results from your work.

<u>Id.</u> at SP 322.

The court concludes that this exclusion has as its goal again making clear that the insurance coverage does not extend to Coronado's liability to Lamar for loss Lamar suffered simply because it did not receive what Coronado promised to provide. However, the exclusion again allows for coverage for damage resulting from water leaks occurring after construction was completed.

F. <u>The Only Insurance Policy Potentially Applicable to Lamar's Claims is Policy No. KK09101297</u>.

St. Paul's Seventh Ground relies on the fortuity doctrine for a ruling that the insurance policies effective from December

31, 2001, through December 31, 2003, cannot form the basis of insurance coverage for any of the damages incorporated in the October 23, 2007, judgment.

Because the record indicates that the roof leaks started in the winter or spring of 2001, the court concludes that the applicable insurance policy is the one in effect from December 31, 2000, through December 31, 2001. Apparently it is the policy that bears policy number KK09101297. None of the other insurance policies appear to be applicable to the water damage claims. Of course, as St. Paul urges in its Eighth Ground, the policy with an effective period of December 31, 1998, to December 31, 1999, has no applicability to this action inasmuch as it expired before Coronado commenced its work on the Worship Center Addition.

V.

## Future Proceedings in This Action

The court expects the parties to take into account the rulings and conclusions expressed in this memorandum opinion and order in all future proceedings in this action, including settlement negotiations, preparation of the pretrial order, trial preparation, and presentation at trial.

Lamar must remember that it brought this suit seeking recovery under the October 23, 2007, state court judgment. The

record of the trial proceeding that led to that judgment clearly defines (with a possible exception of the nature of the damage to the roof in the foyer) the elements of damages included in, and the nature of the recoveries allowed by, the judgment. Lamar does not have the luxury at this time of expanding this case to include other damage allegedly caused by the water leaks, such as alleged mildew damage, sheetrock or wallboard damage, or loss of use.

The court has concluded that the policies issued by St. Paul do not cover the $376,861.20 and $11,000.00 parts of the $617,861.20 actual-damage award made in the judgment, and might or might not cover the $175,000.00 element of the actual-damage award. Obviously, the insurance policies do not provide coverage for the $50,000.00 attorney fee award made to Lamar in the judgment or for any prejudgment or post-judgment interest on the parts of the actual-damage award that are not recoverable under the insurance policies.

If St. Paul had sought a partial motion for summary judgment, the court could have undertaken the task of carving out in partial summary judgment form the parts of the October 23, 2007, judgment that are not covered by the insurance policies. As it is, the court simply is making known to the parties the

court's conclusions on the areas that could have been the subjects of a partial summary judgment for St. Paul, and is instructing the parties to take those conclusions into account in future proceedings.

Now that the parties are aware of the court's conclusions, the parties will be able to engage in more informed settlement discussions. Therefore, the court expects the parties to have a settlement conference as promptly as possible, consistent with the procedures the court ordered in reference to the settlement conference to be conducted by the parties in advance of the pretrial conference, and to provide the court a report on the settlement conference the day following its occurrence.

## VI.

### ORDER

Consistent with the foregoing,

The court ORDERS that St. Paul's motion for summary judgment be, and is hereby, denied.

25

The court further ORDERS that the parties engage in a
settlement conference and report to the court on such conference
as contemplated by the foregoing.

SIGNED February 10, 2009.

_____
JOHN McBRYDE
United States District Judge